J-S71014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Z.H., A MINOR | No. 463 EDA 2016 |

Appeal from the Dispositional Order January 15, 2016
In the Court of Common Pleas of Lehigh County
Juvenile Division at No(s): CP-45-JV-0000197-2015

BEFORE:  BOWES, PANELLA AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 19, 2017**

Z.H. appeals from the January 15, 2016 juvenile delinquency dispositional order that transferred her from the dependency-based placement at Wordsworth Academy to secured placement in the North Central Secured Treatment Facility.  The order was entered after Z.H. made an admission to recklessly endangering another person ("REAP") and criminal conspiracy.  We affirm.

During September 2013, then-thirteen-year-old Z.H. was adjudicated dependent.  One year later, she attacked a caseworker from the Philadelphia Department of Human Services ("DHS") and was charged with aggravated assault, REAP, and simple assault.  The juvenile court determined the simple assault had been substantiated but declined to adjudicate Z.H. delinquent at

_____

* Former Justice specially assigned to the Superior Court.

that juncture. Instead, the juvenile court entered what it styled a "deferred adjudication" and placed her in a dependency group home administered by ChildFirst Services ("ChildFirst"). Z.H.'s record at ChildFirst was replete with behavioral issues including academic suspension, several attempts to abscond from the facility, and being charged with disorderly conduct. Z.H. was participating in a ChildFirst outing when she engaged in the underlying delinquent acts that are the genesis of this appeal.

The juvenile court summarized the relevant incident as follows:

> The assault occurred on April 5, 2015, Easter Sunday, while [Z.H.] and her co-juveniles were on a ChildFirst-sponsored outing to the Stroud Mall, located in Monroe County, to shop and see a movie. The fifty-four year old victim was seated in front of the group in the movie theater. When the group "became rowdy, obnoxious, cursing and very loud, the victim turned around and whispered very nicely asking the girls to please quiet down a bit, my mom cannot hear the movie." (N.T., 11/17/2015, p. 3). The group responded with obscenities and blatant disrespect.

> While walking to their car after leaving the theater, the victim and her family were ambushed and surrounded by [Z.H.] and her housemates in the parking lot of the mall. After directing a volley of obscenities at the victim, [Z.H.] was the first one to assault the victim "by sticking her finger in the victim's eyeball." (N.T., 11/17/2015, p. 4). The victim was then viciously beaten down in front of her family by [Z.H.] and her co-juveniles while two males filmed the episode. After being punched and knocked to the ground, the victim was "kicked in the face, the head, [and] the body. She suffered a broken orbital floor socket of her left eye. The victim had two black eyes, multiple contusions and bruises on her body and . . . was treated in the emergency room." (Id.) In addition, when the victim's sister-in-law attempted to intervene, she was surrounded . . . thrown to her knees, punched . . . in the back of the head and beat . . . up." (Id). After the attack was over and the victim was running to her

vehicle, [Z.H.] continued to pursue. Fortunately, the victim and her family were able to escape without further injury.

Juvenile Court Opinion, 4/25/16, at 2-3.

On November 17, 2015, Z.H. entered an admission to REAP and criminal conspiracy in relation to the violence that she incited at Stroud Mall. In the meantime, Z.H. was removed from ChildFirst due to her disruptive and aggressive behavior. She was transferred to a VisionQuest shelter, but after engaging in bullying and other physical acts against peers, she was transferred to secure detention at the Philadelphia Juvenile Justice Service Center. Even that level of security proved inadequate, however, as she was reprimanded by justice center staff on several occasion for fighting. Ultimately, Z.H. was placed in a dependency program at Wordsworth Academy, a residential education-based facility. Wordsworth Academy is a secured facility in the colloquial sense that its minor residents are supervised at all times and are not permitted to leave the campus without prior approval. Wordsworth Academy is **not** a secured educational treatment unit.

On January 15, 2016, the juvenile court held a dispositional hearing. The court reviewed the social summary and recommendation prepared by the Monroe County Juvenile Probation Office, and considered testimony proffered by the victim, her son, a case worker from Wordsworth Academy and the operational director of DHS. In addition, the court considered the

apologies that Z.H. made to her mother, the juvenile court, and the victim, as well as counsel's argument in opposition to removing Z.H. from Wordsworth Academy. As noted, the juvenile court rejected counsel's position and entered a dispositional order committing Z.H. to the North Central Secured Treatment Facility.

Z.H. filed a post-disposition motion, which the juvenile court denied, followed by a timely appeal. She complied with the court's order to file a concise statement of errors complained of on appeal. She raises one issue on appeal: "Whether the trial court abused its discretion in placing the Juvenile at North Central Secure Treatment Facility when the Juvenile was already placed in a secure facility that was addressing the Juvenile's accountability and rehabilitative needs." Appellant's brief at 4.

We review the juvenile court's disposition order for an abuse of discretion. *In re Love*, 646 A.2d 1233, 1238 (Pa.Super. 1994). "The Juvenile Act is clear that a delinquent's disposition is a duty vested in the discretion of the adjudicating juvenile court. This Court will not disturb a sentence absent a manifest abuse of discretion." *Id*. (citations omitted). The *Love* Court further explained,

> the discretion of the Juvenile Court in implementing a disposition is broad, it is flexible and the Juvenile Court has considerable power to review and modify the commitment, taking into account the rehabilitative progress or lack of it of the juvenile. Without extreme specificity as to the error by the court in imposing the commitment, there can be no basis for setting aside the disposition.

*Id*. at 1238 n.5.

Pursuant to § 6352(a) of the Juvenile Act, the juvenile court's disposition must "be consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare" and "provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community." 42 Pa.C.S. § 6352(a).

Z.H.'s argument is two-fold. First, she asserts that the trial court did not present on the record the reasons for transferring her from the Wordsworth Academy to the North Central Secured Treatment Facility. Next, she complains that the juvenile court's disposition was not a balanced consideration of community protection, accountability, and rehabilitation. Instead, she argues that the juvenile court focused upon punishment under the guise of protecting the community and accountability. Both of Z.H.'s arguments fail.

First, the certified record belies Z.H.'s claim that the juvenile court did not state its reasoning on the record during the dispositional hearing. **See** N.T., 1/15/16, at 24-28. The juvenile court presented its expression of rationale over four pages of the notes of testimony and then concluded,

> I am not sure that the placement you are in [at Wordsworth Academy] [is sufficient] in terms of [the] long term . . .

combination of accountability[,] . . . competencies and safety[.] And for those reasons and the reasons set forth in the social study, I am going to accept the recommendation. I am going to place this young lady in the North Central Secure Female Treatment Unit.

. . .

So [Z.H.], I know it's not what you wanted, I know you're not happy to hear that. I tried to give you the best reasons I could for my decision. I believe it is one that's supported by the facts, by the record, [and] by the history.

*Id* at 28-29. Thus, Z.H.'s first claim fails.

The second aspect of Z.H.'s argument assails the juvenile court's disposition as being unbalanced in favor of retribution and punishment. She contends that the juvenile court either overlooked or discounted the rehabilitation component of the analysis and stressed that a balanced consideration of the three prongs would have removed any doubt that her continued placement at Wordsworth Academy was the only suitable disposition.

After a thorough review of the the parties' briefs, pertinent law, and the certified record, we concluded that the juvenile court cogently and accurately addressed this aspect of Z.H.'s argument in its well-reasoned opinion entered on April 25, 2016. Therefore, we affirm the dispositional

order transferring Z.H. to North Central Secured Treatment Facility on that basis.[1]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/19/2017

_____

[1] It is evident that Z.H. preferred to remain at Wordsworth Academy, where she had shown progress since her pre-delinquency placement in 2015, and have that institution shift the focus of its counseling services from dependency to addressing her delinquency. Nevertheless, in light of the discretion allocated to the juvenile court under the Juvenile Act's statutory framework and the evidence supporting the juvenile court's decision, we cannot discern how the court's rejection of Z.H.'s stated preference is tantamount to an abuse of discretion.

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**
**JUVENILE COURT DIVISION**

IN THE INTEREST OF Z.H.,  : NO. 197 JUVENILE 2015
a minor      :
         : APPEAL DOCKET NO. 463 EDA 2016
         :

## OPINION IN SUPPORT OF ORDER PURSUANT TO PA. R.A.P. 1925(a)

Z.H. (the "Juvenile") has filed an appeal from the Order of Disposition entered on January 15, 2015, following her admission to Recklessly Endangering Another Person (REAP) and Conspiracy to commit REAP. After the appeal was filed, we issued an order directing the Juvenile to file a statement of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b). The Juvenile complied. We now issue this Opinion pursuant to Pa. R.A.P. 1925(a).

The Juvenile is a sixteen year-old high school student who is a resident of Philadelphia County. Before the events giving rise to this case occurred, the Juvenile was adjudicated dependent and then later involved in delinquency proceedings in Philadelphia. Due to her negative behaviors while in the juvenile system, the Juvenile has been in a variety of placements, including the non-secure group home in which she was residing when she committed the assault that led to her admission and the challenged disposition. Up until disposition in this case, all placements were ordered through the Juvenile Division in Philadelphia.

Specifically, the Juvenile has been dependent since September 2013. At that time, she was referred to the Philadelphia Department of Human services (DHS)

1



based on her mother's inability to supervise or care for her due to declining mental and physical health and the Juvenile's own behaviors.

Approximately one year later, on September 24, 2014, the Juvenile attacked her DHS caseworker following a hearing during which the caseworker testified about the Juvenile's truancy. As a result of the attack, the Juvenile was arrested and charged with Aggravated Assault, Recklessly Endangering Another Person, and Simple Assault. She was then placed at ChildFirst Services, a group home located in Lake Ariel, Wayne County, Pennsylvania.

At a delinquency hearing in Philadelphia on October 16, 2014, the charge of Simple Assault was substantiated and the counts of Aggravated Assault and Recklessly Endangering Another Person were dismissed. The Juvenile was given a nontraditional disposition of "deferred adjudication" and "interim probation." She was returned to ChildFirst Services.

The Juvenile consistently exhibited negative behaviors while at ChildFirst services. She had several behavioral issues and write-ups, was charged with Disorderly Conduct, attempted on several occasions to abscond from the facility, and was suspended from school. In addition, she and several other young women from ChildFirst Services committed the assault that gave rise to this proceeding while living there.

The assault occurred on April 5, 2015, Easter Sunday, while the Juvenile and her co-juveniles were on a CHildFirst-sponsored outing to the Stroud Mall, located in Monroe County, to shop and see a movie. The fifty-four year old victim was seated in front of the group in the movie theater. When the group "became rowdy, obnoxious,

2

cursing and very loud, [the victim] turned around and whispered very nicely [asking the girls to] please quiet down a bit, my mom cannot hear the movie." (N.T., 11/17/2015, p. 3). The group responded with obscenities and blatant disrespect.

While walking to their car after leaving the theater, the victim and her family were ambushed and surrounded by the Juvenile and her housemates in the parking lot of the mall. After directing a volley of obscenities at the victim, the Juvenile was the first one to assault the victim "by sticking [her] finger in [the victim's] eyeball." (N.T.11/17/2015, p. 4). The victim was then viciously beaten down in front of her family by the Juvenile and her co-juveniles while two males filmed the episode. After being punched and knocked to the ground, the victim was "kick[ed] in [the] face, the head, the body. [She suffered] a broken orbital floor socket of [her] left eye. [The victim] had two black eyes, multiple contusions and bruises on [her] body and [ ] was treated in the emergency room." (Id.) In addition, when the victim's sister-in-law attempted to intervene, she was surrounded [], [thrown] to her knees, punched [] in the back of the head and beat [] up." (Id). After the attack was over and the victim was running to her vehicle, the Juvenile continued to pursue. Fortunately, the victim and her family were able to escape without further injury.

On May 21, 2015, based on her history and continuing negative behaviors, the Juvenile was removed from ChildFirst and transferred to VisionQuest CBS Shelter. Her time there was short-lived. According to her DHS caseworker, while at VisionQuest the Juvenile engaged in bullying behavior that included "physical acts." The Juvenile resided at VisionQuest until June 22, 2015, when she was transferred to secure detention at the Philadelphia Juvenile Justice Services Center. Three months

3

later, on September 17, 2015, she was placed at Wordsworth Residential Treatment Facility. The Juvenile remained at Wordsworth until disposition was imposed in this case.

In September of 2015, following an investigation, a written allegation was received and the Juvenile was charged with Riot, two counts of Simple Assault, REAP, and Harassment. So were her co-juveniles who, by that time, had all been transferred to separate placements in different geographical regions of the state.

After pre-trial matters were addressed and arrangements were coordinated with the multiple agencies and placement facilities that were involved, an adjudication hearing was convened on November 17, 2015. At the hearing, the Juvenile made a voluntary, counseled admission to REAP and an amended count of Conspiracy to Commit REAP. The remaining charges were dismissed. The Juvenile's four housemates made the same admissions.

At the hearing, the victim recounted the attack, described the injuries she sustained at the hands of the Juvenile and her housemates, and informed the Court and all present of the deep and lasting impact the incident and injuries – mental, emotional, and physical – have had and continue to have on her. We incorporate the victim's statement, some of which is quoted above, into this opinion by reference. (N.T., 11/17/2015, pp. 2-9). The emotional, poignant, and credible statement had a profound impact on almost everyone in the room – everyone, that is, except for the Juvenile and two or three of her former housemates. As the assigned Juvenile Probation Officer aptly described in the Social Study Report he authored, when the Court asked the Juvenile if she had anything to say, the Juvenile offered an atrocious

4

"apology." She blamed the victim, showed disrespect, and failed to take responsibility for her actions. There was not even a hint of empathy or remorse.[1]

Up to this point in the proceeding, we had considered transferring this case and the Juvenile (as well as her co-juveniles) to Philadelphia for disposition. However, given the facts of the case, the obvious state of distress of the victim, who is a Monroe County resident, the disturbing comments and attitude of the Juvenile (and the attitude two of the other young women), and, frankly, the attitude of some of the contracted caseworkers, we chose to impose disposition here.[2] As a result, at the conclusion of the hearing, we issued an order scheduling a disposition hearing and directing that a social study be completed.

The social study was completed and a report issued by our Juvenile Probation Office prior to the disposition hearing. The report was reviewed by the Court, the assistant district attorney, and counsel for the Juvenile prior to disposition. During the hearing, we mentioned several times that the disposition we ordered was based on the reasoning articulated on the record as well as the facts and information contained in the social study report. A copy of the report has been filed and is included in the Certified Record.

---

[1] The Commonwealth asked that the victim's statement be transcribed so that the transcript would be available for the disposition hearing. The request was granted and a transcript of the victim's statement was filed as an excerpt from the adjudication hearing. (N.T., 11/17/2015, pp. 2-9). Neither party asked for transcription of the remainder of the adjudication hearing. As a result, there is no transcript of the statements made by the Juvenile and her co-juveniles. Even if there were, the two-dimensional record would not come close to conveying the shocking manner in which the Juvenile addressed the victim.

[2] We kept and scheduled for disposition the cases involving three of the four co-juveniles. Due to special considerations that did not apply to the Juvenile, the case involving the fourth co-juvenile was transferred to Philadelphia.

The disposition hearing was convened on January 15, 2015. The Juvenile appeared with her attorney. The Juvenile's mother and representatives of DHS, the contracted caseworker agency, and Wordsworth Academy were also present.

We first addressed all co-juveniles together. We identified all persons in the courtroom, informed all present of the purpose of the hearing, and notified the juveniles of their post-disposition and appeal rights. The cases were then called individually and privately for disposition.

In the Juvenile's case, the Assistant District Attorney began by acknowledging the Juvenile's admissions and endorsing both the social summary and the recommendation for placement in a secure state-operated facility, stating that "[a] very thorough social summary has been done by Probation Officer Morgan. The Commonwealth 100 percent supports what is concluded in that; and that is that [the Juvenile] should be placed at North Central Secure Female Treatment Unit." (N.T. 1/15/2015, p. 13). The Commonwealth briefly reiterated the severity of the case and referred to the social study report in support of that recommendation.

In response, the Juvenile's attorney requested that we maintain the current placement at Wordsworth Academy based on the Juvenile's progress at the placement. Counsel took the position that since the Juvenile had been placed at Wordsworth, she had addressed her issues with disrespect, defiance, not respecting authority, and physical aggression, and had done remarkably well there. (*Id.* at 14). Counsel highlighted the Juvenile's good grades an improving relationship with her mother, and suggested that, at Wordsworth, the Juvenile was already in a placement where she receives adequate supervision and treatment. The Wordsworth Academy

6

representative summarized the Juvenile's progress in the program and described the various therapeutic treatments in which she was participating. The representative informed the Court that the Juvenile had not required restraints while in the program and that she had not "recently" been physically aggressive.

The victim and her son then testified as to the vicious beating the victim received and detailed how this event impacted their lives. The victim recounted the horrifying details of the attack and her son added:

> I just wanted to say you mentioned earlier how just two people from the community were affected. That's not true because my little brother had to watch his mom get beat down, his aunt, his grandmother; my little cousin too...And I get a call at the hospital that my mom got beat down. I'm thinking it was a joke at first. And my little brother is like, Get over here now. Okay. So it's not just two people; there's a bunch of people y'all affected.

(N.T. 1/15/2015, p 22).

When asked if she wished to say anything, the Juvenile briefly addressed the court and stated:

> I apologize for my actions that caused both of them to suffer. Even though I can't take back what happened, I will absolutely make sure it will never happen again to anyone else's family or anyone that's around me. I have learned how to channel my anger and restrain myself from the negative thoughts that caused my negative actions. Everyone in here every day is working on being a better person for the next day. I came here with a different mind set and attitude than I did before. And again, I deeply apologize to the Court, the judge, you, your family, and my mom, and everyone else around me.

(N.T. 1/15/2015, p. 23). While the statement and apology showed marked improvement over the statement she made during the adjudication hearing, in real

7

time it seemed practiced, not completely sincere, and somewhat inconsistent with the Juvenile's attempts to minimize her involvement in the assault on the victim.

During the disposition hearing, we referred several times to the Juvenile's delinquency history as the driving factor behind the out-of-home placement that was ordered. (N.T., 11/21/2014, pp. 25-27). That history was well-known to the Court, the Commonwealth, and the Juvenile Probation Office, as well as the Juvenile, her mother, her attorney, and the representatives of DHS, the casework agency, and Wordsworth. We outlined the Juvenile's history, highlighting both the prior and subsequent assaultive behaviors. Importantly, we recognized that although the Juvenile was making progress, "[she was] at ChildFirst Services up in Wayne County for [a] while without much of an incident either, and then something like this happened." (N.T. 1/15/2015, p. 27). With the Juvenile's history in mind, and, after a careful review of the social summary and testimony, we stated:

> I am not sure that the placement you are in, in terms of long term, the combination of accountability and competencies and safety is sufficient. And for those reasons and the reasons set forth in the social study, I am going to accept the recommendation. I am going to place this young lady in the North Central Secure Female Treatment Unit.

(N.T. 1/15/15, p. 28).

At the conclusion of the disposition hearing, we issued the dispositional order placing the Juvenile at North Central Secure that is being challenged in this appeal. In the Order, we made findings required by applicable provisions of the Juvenile Act and the Rules of Juvenile Court Procedure. Among other things, we specifically found and stated that: 1) the Juvenile was in need of treatment, supervision, or rehabilitation; 2) it

8

was contrary to the welfare of the Juvenile to remain in the home of her mother; 3) reasonable efforts were made to prevent removal of the Juvenile from her home; and 4) placement at North Central Secure Treatment Facility was the least restrictive placement that is consistent with the protection of the public and best suited to the Juvenile's treatment, supervision, rehabilitation, and welfare.

On January 22, 2015, the Juvenile filed a post disposition motion seeking reconsideration of disposition. On February 1, 2016, the Juvenile filed a motion for stay of disposition. We denied both motions on February 2, 2015. The Juvenile then filed this timely appeal.

## DISCUSSION

The Juvenile claims that we erred by placing her in North Central Secure Treatment Facility rather than leaving her at Wordsworth. In support of her claim, the Juvenile asserts that 1) she was already placed in a secure placement that addressed community protection, accountability and the rehabilitation of the Juveniles; 2) the Court failed to present any factors other than the severity of the charges; 3) the Court failed to state why placement at Wordsworth Academy was not sufficient; and, 4) the Court did not state why North Central Secure Treatment Facility would better protect the public, address accountability, and meet the Juvenile's rehabilitative needs. (Juvenile's Rule 1925(b) Statement). The Juvenile's assignments of error are meritless.

Under Section 6352 of the Juvenile Act, there are a number of possible dispositions in a delinquency case. The available alternatives include: probation, which may include conditions tailored to the crime and the Juvenile; commitment to an

9

appropriate juvenile facility; an order to pay fines, costs, and when applicable restitution; and any disposition available in a dependency proceeding. 42 Pa. C.S.A. §6352(a)(1)-(6). The disposition imposed must provide for the balanced and restorative justice which the Juvenile Act seeks to achieve, and, when commitment is ordered, should impose the minimum amount of confinement that is consistent with the protection of the public, notions of accountability, and the rehabilitation needs of the child. 42 Pa. C.S.A. §§ 6301(b)(2) and (3) and 6352(a). The Juvenile Act grants broad discretion to the juvenile court in disposition. *In the Interest of D.S.*, 37 A.3d 1202, 1203 (Pa. Super. 2011) (citations omitted). An appellate court will not disturb a disposition absent a manifest abuse of discretion. *Id.* An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment based upon partiality, prejudice or ill-will. *Commonwealth v. Brown*, 26 A.3d 485, 493 (Pa. Super. 2011) (citations omitted).

As our on-record statements and the social study report demonstrate, our decision to place the Juvenile in North Central Secure Treatment Facility rather than leave her at Wordsworth Academy was not an arbitrary or purely punitive determination. Rather, it was a considered and reasoned decision that took into account the facts of this case, the impact of the Juvenile's actions on the victim and the community, the Juvenile's history at home, at school, and in her juvenile court placements, and the balanced and restorative justice principles of accountability, protection of the public, and the rehabilitative needs and prospects of the Juvenile. As we explained, a juvenile disposition must be appropriate and sufficient to

10

hold the juvenile accountable, vindicate the rights of the victims, to make sure that the juvenile is safe and the public is safe, and to find the, you know, place that will have what is needed to provide what the law calls competencies, which are probably easier to understand as whatever treatment, counseling, therapy, and education might be needed so that this type of thing doesn't repeat itself so that we can hopefully make the juveniles comes out better in the -- out of the juvenile system than they were coming in; and hopefully so you don't end up in the criminal system...

(N.T 1/15/16, pp. 24-25). Building on this statement, we later concluded our substantive reasoning by stating:

I am not sure that the placement you are in, in terms of long term, the combination of accountability and competencies and safety is sufficient. And for those reasons and the reasons set forth in the social study, I am going to accept the recommendation. I am going to place this young lady in the North Central Secure Female Treatment Unit.

(N.T. 1/15/15, p. 28).

When the circumstances of this case and the history and conduct of the Juvenile are viewed in light of the applicable standards and principles of balanced and restorative justice summarized above, it is clear that the commitment we ordered was a proper exercise of discretion. The relevant history and the violent nature of the attack are detailed in the social study report and summarized above. They need not be repeated in full. Contrary to the Juvenile's bald assertions, the disposition we ordered did take into consideration the relevant facts, the violent nature of the most recent crime she committed, her history of similar acts, and what placement could best provide the competencies she most desperately needs. Despite her attempt to

11

minimize the incident, it is clear that this was a violent and unprovoked attack which left the victim with serious, long-term mental and physical injuries. These injuries were so extensive that the victim suffered numerous long-term effects, including memory loss, dizziness, persistent headaches, and violent nightmares.

It is important to recognize, as we did and noted on the record, that this was not the Juvenile's first violent offense. Seven months prior to this case, the Juvenile was charged for an attack upon her DHS caseworker. Additionally, she was removed from the ChildFirst placement due to bullying and other physical acts, including an incident that resulted in a Disorderly Conduct charge. (N.T. 1/15/15, pp. 25-26). When the Easter attack is viewed in the light of the Juvenile's past and subsequent conduct and balanced with notions of accountability and rehabilitation, it is clear that the disposition in this case was a proper exercise of discretion.

When reduced to its core, the Juvenile's argument amounts to a bald assertion that the placement is excessive because we "focused only upon the severity of the crime," wholly ignoring the progress she had made at Wordsworth. In support of her claim, the Juvenile points to her grades and the fact that she purportedly had no behavioral incidents since being enrolled at Wordsworth Academy, or at least no incidents that were "recent" in relation to the disposition hearing. Even looking past the Juvenile's post-attack assaultive behavior at VisionQuest, her claim that the Court ignored her "significant progress in addressing the rehabilitation goals targeted for the juvenile offender during her period at Wordsworth Academy" is belied by the record. We took her progress into account, but balanced her progress against all other factors and considerations. We noted that, in the past, the the Juvenile had periods in which

12

she seemingly made progress, or at least did not have a major incident, but then violence erupted. The Juvenile's attack on her caseworker and the assault on the victim in this case are clear examples. In any event, the Superior Court of Pennsylvania has routinely rejected general excessiveness claims when the Court has articulated valid reasons for the placement. For example, in *Commonwealth v. K.M.-F*, 117 A.3d 346 (Pa. Super. 2015), the Superior Court recently rejected a juvenile's argument that an out-of-home placement was excessive due to the fact that he had made great progress during the 17 months since the offense, in a case in which the juvenile court highlighted impact on the victim, public safety, and accountability as reasons for the placement.

Here, as in *K.M.-F.*, we considered the impact of the Juvenile's actions on the victim, public safety, and accountability, as well as the other factors and considerations discussed above. We determined that the Juvenile needed a higher level of accountability, and of treatment and rehabilitation, than she was receiving. In this regard, it appeared to us that the Juvenile had previously been "under placed." We were also concerned with the Juvenile's lack of remorse and minimization of her role in the assault. As a result, we determined that placement at North Central Secure, a state operated facility with which the Court is familiar, that has programs particularly suited to the rehabilitative needs of the Juvenile, that can provide necessary competencies, that can also provide a proper measure of accountability, that can properly and objectively perform risk analyses and assess the Juvenile's progress, that can continue family therapy and reunification efforts, and that can accomplish all of this in a setting that provides safety for the public and the Juvenile, provides for public

13

and community safety as well as the safety of the Juvenile, was the most appropriate placement for the Juvenile.[3] Under the facts of this case and the applicable law, we stand firmly behind our placement determination.

For these reasons, as well as those we stated on the record, we believe that the order of disposition should be affirmed.

BY THE COURT,

DATE: 4/25/16

JONATHAN MARK, J.

Cc:   Superior Court of Pennsylvania
      Jonathan Mark, J.
      Public Defender (MP)
      District Attorney (MB)

2016 APR 25 PM 2 05
MONROE COUNTY, PA
CLERK OF COURTS

---

[3] We note that counsel for the Juvenile characterized Wordsworth as a secure facility. It is not. Wordsworth is a Residential Treatment Facility, not a secure juvenile facility.

14